[No. A108528. First Dist., Div. Four. Nov. 30, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDIE PAUL JORDAN, Defendant and Appellant.

## COUNSEL

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Jeffrey M. Laurence and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

SEPULVEDA, J.—A jury found defendant, Randie Paul Jordan, guilty of attempted second degree robbery.[1] (Pen. Code, §§ 664, 211.)[2] Following the jury's verdict, the trial court found that defendant had suffered a prior conviction for forgery (§ 470, subd. (a)), and a prior conviction for second degree robbery (§ 211). The trial court denied defendant's request to strike his prior serious felony conviction for second degree robbery and sentenced him to 10 years in state prison. Defendant contends that the trial court committed *Batson-Wheeler* error (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*)), and that the failure to retain the juror questionnaires of the entire venire has denied him his constitutional right to an adequate record on appeal. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Trial Evidence*

Because of the nature of the issues raised on appeal, it is not necessary to detail the evidence upon which defendant was convicted. In short, defendant

---

[1] The jury acquitted codefendant Kenneth Branche.

[2] All further statutory references are to the Penal Code.

approached a 55-year-old woman as she tried to enter her office located in Oakland, and began tugging and yanking on the victim's purse, which she wore on her shoulder. The victim was scared, but did not see a weapon. As the victim began to scream, defendant kicked her in the leg, and then punched her in the face, all the while trying to get her purse. The victim kept screaming to get attention, and held on to her purse.

The victim's coworkers, both inside the office building and in the parking lot, heard her screams and came to her aid. As the victim's coworkers were chasing defendant, a faded blue Pontiac Firebird pulled up to the intersection of 21st Avenue and Telegraph Avenue. Defendant then opened the passenger door and got in.

The incident was reported to the Oakland Police Department. The officer who arrived at the scene observed that the victim was visibly shaken and had redness and swelling on the right side of her face. Approximately 15 minutes after the dispatch call, another officer stopped a car matching the description of the getaway car. Codefendant Branche was alone in the car at the time of the stop. Defendant was later apprehended riding a bicycle in Oakland.

The victim viewed a photo lineup, and identified defendant as the person who tried to take her purse. Although the victim was later concerned about the accuracy of her identification, defendant admitted that he tried to take a woman's purse earlier that day, and that the woman would not let go of it. Defendant blamed his actions on drug use.

B. *Voir Dire*

The venire was comprised of 95 prospective jurors. The prospective jurors were given questionnaires prior to the commencement of voir dire.

Defense counsel objected to the prosecutor's fourth, eighth, and 10th peremptory challenges because they were used against African-American women. The only identifying information about the women in the record is their respective juror numbers. Accordingly, we refer to the women as Jurors Nos. 7, 70, and 81.

1. *Juror No. 70*

Each questionnaire asked, "Have any members of your family or household, friends or co-workers ever been arrested, accused or charged with a crime?" During initial questioning by the court, Juror No. 70 stated that her

uncle had been in prison in Texas in 1963. She was uncertain of the exact offense, but thought it was "probably theft." Juror No. 70 further stated that her uncle had also been in jail in California, possibly for drugs, but she was "not really sure." Juror No. 70 also stated that in 1974, her sister's former boyfriend, an Oakland police officer, was investigated by internal affairs.

Juror No. 70 had served on a jury in May of the previous year, and appealed to the court about having to serve again in the instant case. Since the trial in this case began in July, the trial court told Juror No. 70 that it had been over 12 months since her last service, and that she was technically eligible for jury service.

After questioning other jurors, the trial court came back to Juror No. 70, stating that it had forgotten to ask her about her answer in the questionnaire to a question that asked, "What is the first thing that comes to mind when you think of: [¶] Police Officers," to which Juror No. 70 replied "racial profiling." Juror No. 70 expressed surprise that the trial court had not asked her about this response earlier. She explained that minorities, especially men, are racially profiled for traffic stops, even in the absence of any criminal activity. Juror No. 70 believed that racial profiling happens in the United States in general, and that it commonly happens in connection with Hispanic and African-American males. At one point Juror No. 70 stated that she believed racial profiling was wrong, but later stated that she thought it was okay to stop a person "if they fit a certain profile," and if the police "find something."

2. *Juror No. 81*

Juror No. 81 had been physically and mentally abused by her former husband from approximately 1986 to 1996. In initial questioning by the trial court, Juror No. 81 stated that she had called Oakland police about five times during this 10-year period. Juror No. 81 believed that the Oakland police officers had not been very responsive to her situation, stating that the police officers would either have her former husband leave the home or have her leave instead. She further stated that Oakland police officers never indicated that they would arrest her former husband and request prosecution from the district attorney's office. Eventually, Juror No. 81's former husband was arrested after breaking into her home. She knew that he had been convicted of an offense, but was uncertain of the details.

Juror No. 81 was not sure if her past experiences with the Oakland police would affect her ability to evaluate the testimony of Oakland police officers who might testify. When further questioned by the court, Juror No. 81

indicated that her past experiences "probably wouldn't" affect her ability to be fair and impartial.

When questioned by the prosecutor about her interactions with the Oakland Police Department, Juror No. 81 stated that some were positive and some were negative. She explained that she felt that the police had not given her the support she needed and had not been sympathetic. However, Juror No. 81 stated she would not view a police officer's testimony with more suspicion than another witness's testimony. She further denied that she would vote not guilty, if it came to light that the police officers made mistakes in their investigation, just to send a message.

### 3. *Juror No. 7*

When questioned by the trial court, Juror No. 7 stated that she could be fair and impartial. Juror No. 7 stated that her brother had been convicted of possession of drugs in Oakland in the early 1980's. She did not attend any of his court appearances. When asked whether she felt her brother had been treated fairly by the justice system, she replied: "I, actually, can't say that I feel a lot about it, because he knew that he was wrong, so . . . he suffered the consequences." Juror No. 7 believed that her brother's sentence was appropriate. Juror No. 7's sister had been involved in two cases involving prostitution and possession of drugs. Juror No. 7 did not attend any of those court proceedings, and did not have any opinion regarding her sister's treatment in her various cases. Juror No. 7 stated that her sister "did what she did, and she paid for it." Juror No. 7 further stated that she did not think her sister was treated unfairly, but qualified the response by stating that she was not present during the criminal proceedings.

Juror No. 7's son was charged and convicted of assault in Oakland in the late 1980's. Her son's case did not proceed to a jury trial and took a while to resolve. Juror No. 7 attended her son's final court appearance. She thought her son "served about a year." When asked whether she thought her son had been treated fairly, she replied, "Well, from what he explained to me, it was fair."

Juror No. 7 also had a close friend in the 1960's who was convicted of rape. She was not sure where the crime was committed, but thought her friend told her it occurred in Kansas. She did not attend any of the court proceedings and had no opinion about whether he was treated fairly.

In her juror questionnaire, Juror No. 7 wrote, "Trouble," as the first thing that came to mind when she thought of police officers. She explained that she lived in an African-American and Hispanic neighborhood, and that

"it's always something going on. So when you see the police coming, you know he's not going to tell you that you're a millionaire. So there's trouble." Juror No. 7 believed that some police officers create trouble and some do not. She also had witnessed the police acting inappropriately in her neighborhood. She gave the example of a police chase in which the suspect fell and the police officer attempted to hit the suspect, but was stopped by another officer.

In her juror questionnaire, Juror No. 7 wrote, "What's next?" as the first thing that came to mind when she thought of prosecutors. When asked by the court to explain this response, she stated, "Well, you're sitting in the court, you know, listening to things, and you hear a lot of different type things, so I said what's next." When the court further inquired about some of the negative things Juror No. 7 thought about regarding prosecutors, she replied, "Similar questions they ask." Juror No. 7 explained that she was referring to the questions asked in a civil case in Oakland, in which she was a prospective juror. Juror No. 7 thought the questions posed to jurors were strange. She denied that her "What's next?" comment related to family and friends who had been convicted.

Juror No. 7 also wrote in her questionnaire that the first thing that came to mind when she thought of defense attorneys was, "Make the right decision." When asked to explain this response, she stated, "Well, you know it's really complicated, that one, the way I stated that in any . . . . [¶] . . . trial that you come in contact with, you would hope that they based on the evidence. You hope that, you know, the right decision arise[s] from all that." She further explained that she was referring to the jury making the right decision, while listening to the defense attorneys.

Each questionnaire asked, "What are your feelings about the fairness and effectiveness of the criminal justice system?" Juror No. 7 wrote that she thought that it needed a little updating. When asked to explain this response, Juror No. 7 stated she was referring to the police department. She further stated, "you have some good; some bad. I've seen some of both. That's all." She believed that improvement in police department personnel was required in general.

When questioned by the prosecutor, Juror No. 7 stated that her brother had been arrested in Oakland by the Oakland Police Department at least five times. Juror No. 7 stated that she did not hear any negative reports from her family about her brother's arrests. She did not believe that her brother had been harassed by Oakland police, stating, "he just got caught. That's all."

Juror No. 7 also stated that her sister had been arrested by Oakland police two or three times. When asked about how she felt about her sister's arrests, Juror No. 7 stated, "I didn't like it, but it wasn't anything I could do about it . . . . [¶] . . . I didn't like it that she got herself into that kind of predicament."

Juror No. 7 stated that her son's arrest caused her a lot of pain. Juror No. 7 was also pained by seeing her son go through the system. She denied that she was angry at the district attorney's office or the police. She said, "I talked to [my son] and he told me the truth. So, . . . he [had] to suffer the consequences of it, and he knew that, and he told me that." Juror No. 7 stated that she did not have any lingering feelings of resentment or bitterness towards the prosecutor in the instant case. When asked how she would view the testimony of a police officer who happened to be the only witness, Juror No. 7 stated that she would analyze what he said "a little bit closer." Juror No. 7 explained that she would take a closer look at the testimony, not because it came from a police officer, but because it came from the only witness. Juror No. 7 did not think that she would view a police officer's testimony with more scrutiny, if the testimony conflicted with a civilian witness's testimony. Later, when questioned by defense counsel, Juror No. 7 stated that if multiple witnesses were involved, she could treat each one with the same level of scrutiny.

## C. Batson-Wheeler *Motion and Ruling*

Defense counsel made a *Batson-Wheeler* motion on the grounds that the prosecutor had used three of her 10 peremptory challenges exercised at that point to excuse African-American women. Defense counsel noted that there had been a total of eight African-American jurors in the venire, six of whom had been excused, three for cause, and three peremptorily challenged by the prosecutor. Defense counsel stated that the two remaining jurors were Juror Nos. 56 and 76 (who was seated in the jury box). The trial court observed that the prosecutor had excused "three of the four of African-Americans who were in the jury box,"[3] constituting 75 percent, which "could raise an inference of discriminatory purpose. [¶] Okay. Then I'll find that it's very borderline, but I'll find that a possible inference of discriminatory purpose."

---

[3] Defense counsel later sought to clarify the record to note that Juror No. 76 was not African-American, but was actually born in Africa, and was an East African immigrant. After the *Batson-Wheeler* motion, Juror No. 56 was excused for cause. Juror No. 75, an African-American woman, was subsequently called to the box and sat on the jury. Thus, it appears from the record that there were nine prospective jurors of African descent, eight African-Americans and one African immigrant.

## 1. *Explanations by the Prosecutor*

In giving reasons for excusing Juror No. 70, the prosecutor noted that in her questionnaire, Juror No. 70 wrote, "I prefer not to serve since I just served last year in May." The prosecutor further noted that when Juror No. 70 was questioned by the court, she specifically appealed to get out of jury service. The prosecutor asserted that Juror No. 70's comments indicated that she did not want to be a juror in this case. The prosecutor was also concerned that Juror No. 70 said "racial profiling" was the first thing that came to mind when thinking about police officers, and that Juror No. 70 had this response to all police officers in general. The prosecutor further noted that when the court questioned Juror No. 70 about her racial profiling response, Juror No. 70 said she had been wondering why the issue was not discussed earlier. The prosecutor argued that this response "implies that she is either, one, trying to be—say as much as she can . . . to get off the jury, or, two, she was being untruthful. Either way, I don't believe she would be a good juror for this case." Finally, the prosecutor asserted that Juror No. 70 was chewing gum throughout the proceedings and while answering questions, which she believed showed a lack of respect to the court.

With respect to Juror No. 81, the prosecutor cited her domestic violence problems and that she was "very critical" of how the Oakland Police Department had handled the investigation. The prosecutor further asserted that "given her reluctance to even talk about her case any more frankly or openly with the Court, it appears to me that she still harbored some feelings about what had happened to her. And given that police investigation will be an issue in this trial, I don't believe she can set that aside, and that she will judge the Oakland Police Department much more harshly."

The prosecutor also noted that Juror No. 81 had failed to answer some of the questions on the questionnaire, including question 19. Finally, the prosecutor cited the fact that Juror No. 81 did not talk much about her spouse, and indicated that since she was a victim of domestic violence, she "[might] have some feelings, lingering feelings, about any women who was [*sic*], perhaps, attacked or assaulted." The prosecutor asserted that the victim in this case was a woman, and while it is possible that Juror No. 81 would be sympathetic, there was a concern that Juror No. 81 might feel that the Oakland Police Department did not do a sufficient job of investigating the case.

Regarding Juror No. 7, the prosecutor cited the multiple arrests in her family by the Oakland Police Department. While Juror No. 7 said that she

could try to set this aside, the prosecutor did not think that Juror No. 7 could "view or judge the Oakland Police Department in a fair light." In addition, the prosecutor "noticed that there was a discrepancy, the way she answered questions . . . on the arrests involving her brother and sister and involving her son. She was a little more defensive with me when I asked a question about her son. Her son, who was assaulted[4] and, also, arrested by an Oakland police officer, she felt a lot of pain about that. She still has feelings about that, and her son still lives with her. [¶] Based on her questionnaire, her son is 44 years old, and I think she's going to sympathize with the defendant in this case, because the defendants are the approximate age as her son." The prosecutor cited *People v. Moss* (1986) 188 Cal.App.3d 268, 280 [233 Cal.Rptr. 153], in which the prosecutor felt the juror would identify with the defendant in that case, given the fact that the juror's sons were about the same age.

In addition, the prosecutor was concerned about Juror No. 7's feelings regarding the police, noting that the first thing that came to her mind about police was "trouble." The prosecutor believed that "in light of the fact that her family members all have had dealings with the Oakland Police Department, I don't think it's—it's not unreasonable why she would view the Oakland Police Department that way. But nonetheless, she will be judging the Oakland Police Department in a different manner in this case. She mentioned that it means there's trouble in her community whenever she sees the police[] . . . perhaps chasing somebody else or has to do with someone in her family or in her community." The prosecutor believed that Juror No. 7's thoughts about the police went "hand in hand with how she felt . . . about defense [attorneys]." The prosecutor felt that Juror No. 7's "make the right decision" response regarding defense attorneys indicated that she was "clearly defense-oriented," and that she could not be fair in this case.

The prosecutor denied questioning only African-Americans about police misconduct. She asserted that she specifically questioned Juror No. 34, a Hispanic man, about police misconduct involving his brother-in-law. As Juror No. 34 stated that the misconduct had occurred in Modesto and did not involve the Oakland Police Department, the prosecutor did not feel it was something to be concerned about.

### 2. *Argument by Defense Counsel*

Defense counsel acknowledged that Juror No. 70 indicated "racial profiling by the police officer" on her questionnaire, but claimed that Juror

---

[4] The prosecutor later clarified that Juror No. 7's son had not been assaulted by the police, but had an assault case.

No. 70 also indicated that there were some good and some bad officers. Defense counsel asserted that several other unchallenged jurors, specifically Juror Nos. 39 and 76, also stated that there are good and bad officers. Counsel further asserted that Juror No. 79 indicated that she might have a problem with some police officers, as did Juror No. 22. The court noted that Juror No. 79 did not have any personal experiences with the police. Rather, Juror No. 79 indicated that her friend had reported that the police were not sympathetic with her. The court further pointed out that Juror No. 22 did not indicate having any bad experiences with police officers. Defense counsel stated that Juror No. 23[5] indicated that it was possible for police to fabricate evidence. The court noted nothing in the questionnaire related to fabrication of evidence by the police. Rather, Juror No. 23 accepted the premise asserted by defense counsel that it was possible for police to fabricate evidence.[6] Defense counsel believed that Juror No. 70 credibly explained her views on racial profiling. Counsel denied seeing Juror No. 70 chewing gum, and did not believe that gum chewing showed a sign of disrespect. Finally, defense counsel claimed that many of the jurors had previously served on a jury and preferred not to serve. Counsel asserted that Juror No. 63[7] had given the court many reasons why she did not want to serve, but the prosecutor had not excused her.

Regarding Juror No. 81, defense counsel argued that she said she could set aside her feelings about the Oakland Police Department and judge them independently. Defense counsel asserted that Juror No. 81, like the other challenged jurors, said she could be fair. Counsel further claimed that Juror No. 81's domestic violence claim had been "handled," and that she was willing to answer further questions in private if required to do so. Counsel did not understand the prosecutor's concern with respect to there being a female victim in this case. Finally, counsel asserted, without providing specific details, that many people skipped questions on the questionnaire.

As to Juror No. 7, defense counsel clarified that her son was not assaulted by the police, but instead had an assault case. Counsel stated that it was understandable that Juror No. 7 viewed her son's case differently. He argued

---

[5] Juror No. 23 was not sworn to hear the case.

[6] Defense counsel's questioning of Juror No. 23 regarding the fabrication of evidence is as follows: "Q. . . . Do you believe it's possible—do you believe police officers do fabricate evidence or lie? [¶] A. They might. [¶] Q. Do you believe they do? [¶] A. Yeah, there might be some." Juror No. 23 was also questioned by defense counsel about the response in the questionnaire about defense attorneys, "Some good, some bad, some sleazy." Juror No. 23 stated that she would view a police officer's testimony as being more credible than others, if the officer had experience on a given subject.

[7] Juror No. 63 was not sworn to hear the case.

that Juror No. 7 "adequately and thoroughly explained her explanation with regards to police officers and defense attorneys." Defense counsel asserted that Juror No. 7's description of "trouble" was accurate, stating that when someone sees a police officer, he or she assumes he is responding to a crime, and that there is trouble in his or her neighborhood. With respect to Juror No. 7's comment about defense attorneys, counsel claimed that "making the right decision" meant only that she hoped when a criminal defendant went to trial, the jury would make the right decision and that it would hold "the prosecution to the burden of proof." Defense counsel maintained that Juror No. 7 was articulate and neutral in her responses, and that she was honest.

Finally, defense counsel argued that all three challenged African-American jurors said they could be fair. Counsel also claimed that two prospective jurors had been sleeping, but that did not seem to bother the prosecutor. Additionally, the prosecutor had not challenged other prospective jurors who had family members that had been arrested. The prosecutor countered this argument by noting that she had excused Juror No. 26, a White female, who had negative feelings about the police.

Defense counsel also argued that young African-American men are typically kept off juries.[8]

### 3. Trial Court's Ruling

The trial court accepted the race-neutral explanations provided by the prosecutor as to all three jurors, but expressed some concerns about the explanations of Juror No. 7: "[Accept][9] the explanations excusing 81 and 70, it's a little more troubling with regards to excusing Juror 7, and I see [the prosecutor's] explanations as with regards to numerous contacts or family has had the initial response about police officers, trouble, defense attorneys making the right decision. [¶] Despite the fact that I have some problems with her race-neutral explanation for Juror 7, I [accept] her explanations on the other-two, and it's not that I completely disagree with the explanations. I'm just not comfortable with the explanation as to Juror 7. I certainly don't believe there's a history of excluding African-Americans in Alameda County . . . . [¶] As far as the sleeping jurors, I asked my staff. My Bailiff didn't notice. My Court Reporter didn't notice. My Clerk didn't notice. . . . I am sorry I didn't notice if it happened. . . . [¶] I do accept, as I indicated, the explanations, and that I don't believe that the defense has proven a purposeful

---

[8] Defense counsel stated, "In 35 years, I've never had a male juror under the age of 40, male [B]lack juror under the age of 40. . . . I've never had a jury that has had more than two African-Americans on it in all of those years, although there are . . . many, many on the panel."

[9] The record has been corrected to insert the word "accept" in place of "except."

discrimination in the exercise of peremptory challenges by the prosecution. . . . [¶] So defense motion on the basis of *Wheeler* is denied."

## II. DISCUSSION

A. Batson-Wheeler

■ Race-based use of a peremptory challenge violates the federal constitutional guaranty of equal protection of the law, as held in *Batson, supra,* 476 U.S. 79, and the state constitutional right to a jury drawn from a representative cross-section of the community, as held in *Wheeler, supra,* 22 Cal.3d 258 (*People v. Huggins* (2006) 38 Cal.4th 175, 226 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Cornwell* (2005) 37 Cal.4th 50, 66 [33 Cal.Rptr.3d 1, 117 P.3d 622]). "*Batson* states the procedure and standard to be employed by trial courts when [a challenge is] made. 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Cornwell, supra,* 37 Cal.4th at pp. 66–67, quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].)

■ Here, the court found a prima facie case (unchallenged on appeal), thus shifting the burden to the prosecutor, and the prosecutor gave facially neutral reasons for each strike. We are therefore concerned with the third step of the analysis (*People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769]; accord, *Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769] (*Purkett*)), whether there was purposeful racial discrimination. That step required the court to make " ' "a sincere and reasoned attempt to evaluate the prosecutor's explanation[s] in light of the circumstances of the case as then known" ' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852])—i.e., "all of the circumstances"; (*People v. Johnson* (2003) 30 Cal.4th 1302, 1322 [1 Cal.Rptr.3d 1, 71 P.3d 270], overruled on other grounds in *Johnson v. California, supra,* 545 U.S. 162, 173.) "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' (*Purkett, supra,* [514 U.S.] at [p.] 768 [131 L.Ed.2d 834, 115 S.Ct. 1769].)" (*Rice v. Collins* (2006) 546 U.S. 333, 338 [163 L.Ed.2d 824, 126 S.Ct. 969, 974].)

In evaluating the explanations proffered by the prosecutor, the trial court must inquire: "[W]as the reason given . . . a 'legitimate reason,' legitimate in the sense that it would not deny defendant[] equal protection of law [citation], or was it a disingenuous reason for a peremptory challenge that was in actuality exercised solely on grounds of group bias?" (*People v. Reynoso, supra*, 31 Cal.4th at p. 925.) "[W]e are mindful that ' "[i]f the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' [Citations.] In a case in which deference is due, '[t]he trial court's ruling on this issue is reviewed for substantial evidence.' [Citation.]" (*People v. Huggins, supra*, 38 Cal.4th at p. 227.)

The trial court here made a sincere and reasoned effort to evaluate the prosecutor's explanations for her excusal of the prospective jurors. Therefore, we accord deference to its conclusions and review its ruling for substantial evidence.[10]

## B. *Sufficiency of the Record*

The Alameda County Clerk retained only the juror questionnaires of the 12 trial jurors and the two alternates. This fact came to light after we granted defendant's motion to augment the record with the juror questionnaires. Defendant contends that the failure to retain the questionnaires of all of the prospective jurors has denied him his due process right to an adequate appellate record and thus prevents effective review of his *Batson-Wheeler* issue.

■ "A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law.

---

[10] Citing *Rice v. Collins, supra*, 546 U.S. 338 [126 S.Ct. at p. 974], defendant argues that part of the appellate court's role in "reviewing the judgment entails determining whether the trial court acted *reasonably* in accepting the prosecution's proffered justification for excusing the three African-American jurors." (Italics added.) That is not how we read *Rice v. Collins*, which involved a federal habeas corpus petition under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). (*Id.* at p. 337.) There, the court expressly noted the differences between direct appeals and federal habeas corpus petitions under AEDPA: "On direct appeal in federal court, the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error. *Hernandez v. New York* [(1991)] 500 U.S. 352, 364–366 [114 L.Ed.2d 395, 111 S.Ct. 1859] . . . (plur. opn.) (holding that evaluation of a prosecutor's credibility 'lies "peculiarly within a trial judge's province" '). Under AEDPA, however, a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2)." (*Rice v. Collins, supra*, 546 U.S. at p. 338 [126 S.Ct. at p. 974].) As the instant case does not involve a federal habeas corpus petition, 28 United States Code section 2254(d)(2) is not applicable. In any event, this section would afford more, not less, deference to the trial court's credibility finding. (See *Rice v. Collins, supra*, 546 U.S. at pp. 343–344 [126 S.Ct. at p. 977] (conc. opn. of Breyer, J.).)

(*People v. Howard* (1992) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) It is true as well under the United States Constitution . . . (*People v. Howard, supra*, 1 Cal.4th at p. 1166.) The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. (See *id.* at pp. 1165–1166.)" (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

In *People v. Ayala* (2000) 24 Cal.4th 243, 270 [99 Cal.Rptr.2d 532, 6 P.3d 193], and *People v. Alvarez, supra*, 14 Cal.4th at page 196, footnote 8, the California Supreme Court held that lost juror questionnaires did not impede meaningful appellate review of a *Batson-Wheeler* claim. (See also *People v. Haley* (2004) 34 Cal.4th 283, 305 [17 Cal.Rptr.3d 877, 96 P.3d 170] [applying *People v. Ayala* and *People v. Alvarez* in the context of challenge for cause].) In *People v. Alvarez,* the court held that it is the defendant's burden to show that a deficient record prejudiced his ability to prosecute his appeal. (*People v. Alvarez, supra*, 14 Cal.4th at p. 196, fn. 8.) There, the court determined that the defendant had not met his burden of showing that the absence of the juror questionnaires prejudiced his ability to assert his *Batson-Wheeler* claim. (*Ibid.*) "Indeed, material from the now lost items survives in the reporter's and clerk's transcripts through quotation and paraphrase." (*Ibid.*) In *People v. Ayala,* the court explained that despite the absence of the juror questionnaires the record was sufficiently complete to decide defendant's *Wheeler* claims. (*People v. Ayala, supra*, 24 Cal.4th at p. 270.)

Defendant maintains that the "weight of the holdings" in *People v. Ayala, supra*, 24 Cal.4th 243, and *People v. Alvarez, supra*, 14 Cal.4th 155, is "questionable" in light of *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*), and *Johnson v. California, supra*, 545 U.S. 162. He maintains that a "much more detailed *de novo*-type review is required in California by the federal constitution." We disagree.

In *Johnson v. California,* the United States Supreme Court addressed the "narrow but important" issue of the scope of the first *Batson* step. (*Johnson v. California, supra*, 545 U.S. 162, 168.) The question before the court was "whether *Batson* permits California to require at step one that 'the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias.' [Citation.]" (*Ibid.*, quoting *People v. Johnson, supra*, 30 Cal.4th at p. 1318.) The court held "that California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima case." (*Johnson v.

*California, supra*, 545 U.S. at p. 168.) In so holding, the court reasoned that it "did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra*, 545 U.S. at p. 170.)

In *Miller-El*, the trial court found the defendant had made a prima facie case of discrimination, thus requiring the prosecutor to state the reasons for his challenges to specific jurors. (*Miller-El, supra*, 545 U.S. at p. 236.) After hearing from the prosecutor, the trial court proclaimed his stated reasons were " 'completely credible [and] sufficient' " and denied the motion. (*Ibid.*) The Supreme Court reversed, and held that in the context of a challenge of an African-American juror, the defendant had established purposeful discrimination under *Batson* and was entitled to relief on that ground in federal habeas corpus proceedings. (*Miller-El, supra*, 545 U.S. at p. 237.) In so holding, the high court observed: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241.)

In *Miller-El*, the high court performed a comparative juror analysis. (*Miller-El, supra*, 545 U.S. at pp. 239–252; see also *id.* at pp. 278, 285 (dis. opn. of Thomas, J.).) As part of this analysis, the court reviewed the transcripts from voir dire and compared the juror questionnaires of the challenged and seated jurors.[11] (*Id.* at pp. 241–245.) The court "thought it fitting to consider, albeit as a less significant factor than the side-by-side [juror] comparisons it undertook, the statistic that 'the State ha[s] peremptorily challenged 12% of qualified nonblack penal members, but eliminated 91% of the black ones.' ([*Miller-El, supra*, 545 U.S. 240, 266].)" (*People v. Huggins, supra*, 38 Cal.4th at p. 233.) In another component of its analysis, the high court examined whether the prosecutor employed disparate questioning and trickery when questioning African-American jurors on their views of the death penalty and minimum acceptable sentences. (*Miller-El, supra*, 545 U.S. at pp. 242–245, 248–249, 255, 260.) Finally, the court discussed the use of "jury shuffling" and the evidence of historical discrimination by the Dallas County District Attorney's Office. (*Id.* at pp. 275–276.)

---

[11] Although there was some question whether the state appellate court considered the juror questionnaires, the high court, nonetheless, reviewed them. (*Miller-El, supra*, 545 U.S. at p. 247, fn. 6.)

██ Contrary to defendant's assertion, we find nothing in *Johnson v. California* or *Miller-El* as calling into doubt California Supreme Court precedent pertaining to the effect of lost juror questionnaires. Nor do we find anything in either decision requiring a more "de novo-type" review of trial court's ruling at *Batson*'s third step. Our Supreme Court recently explained that "[t]he fundamental inquiry remains the same after *Miller-El* as before: Is there substantial evidence to support the trial court's ruling that the prosecutor's reasons for excusing prospective jurors were based on proper grounds, and not because of the prospective jurors' membership in a protected group? If so, then defendant is not entitled to relief. In undertaking this inquiry, we note that the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects . . . . *Miller-El* teaches that if a 'stated reason does not hold up, its pretextual significance does not fade because . . . an appeals court, can imagine a reason that might not have been shown up as false.' (*Miller-El, supra,* [545 U.S. at p. 252].)" (*People v. Huggins, supra,* 38 Cal.4th at p. 233.) Our Supreme Court explained that it would confine its review "to whether the prosecutor . . . honestly found pertinent and legitimate dissimilarities between members of the group he challenged and the group he accepted." (*Ibid.*)

Defendant maintains that the record is insufficient because *Miller-El, supra,* 545 U.S. 231, and recent California Supreme Court precedent requires an appellate court to engage in a comparative juror analysis for the first time on appeal. According to defendant, the absence of the questionnaires from the unseated jurors prevents this court from determining: "(1) what percentage of the total available African-American jurors [was] challenged at each point in the proceedings; (2) what the racial composition of the jury was at the time of each challenge; (3) whether unchallenged, but unsworn, jurors had similar questionnaire responses to challenged jurors; (4) whether jurors with certain questionnaire responses were questioned more or less closely than others; (5) whether the prosecution tried to rehabilitate some jurors with similar questionnaire responses to those of the challenged jurors, who were not rehabilitated; (6) whether the original answers on the challenged jurors' questionnaires had been misinterpreted by the prosecution and/or the court below."

██ Preliminarily, although it appears that the *Miller-El* court performed a comparative juror analysis for the first time on appeal (see *People v. Huggins, supra,* 38 Cal.4th at p. 232), the high court did not mandate that such an analysis be performed by an appellate court. (*People v. Gray* (2005) 37 Cal.4th at 168, 189 [33 Cal.Rptr.3d 451, 118 P.3d 496] ["*Miller-El*[, *supra,* 545 U.S.

231] thus did not consider whether an appellate court must conduct a comparative juror analysis in the first instance, when the objector has failed to make a prima facie showing of discrimination, or whether an appellate court must conduct a comparative juror analysis for the first time on appeal, when the objector failed to do so at trial"].) Moreover, contrary to defendant's implied assertion, the California Supreme Court has not mandated that a comparative juror analysis be performed for the first time on appeal. Rather, our Supreme Court has repeatedly stated that it would assume without deciding that comparative juror analysis for the first time on appeal is constitutionally required. (See *People v. Huggins, supra,* 38 Cal.4th at p. 232; *People v. Avila* (2006) 38 Cal.4th 491, 546 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Jurado* (2006) 38 Cal.4th 72, 105 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Schmeck* (2005) 37 Cal.4th 240, 270 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *People v. Gray, supra,* 37 Cal.4th at p. 189; *People v. Cornwell, supra,* 37 Cal.4th at p. 71; *People v. Ward* (2005) 36 Cal.4th 186, 203 [30 Cal.Rptr.3d 464, 114 P.3d 717].)

When our Supreme Court has engaged in comparative juror analysis, the relevant inquiry has been centered on the responses of the challenged jurors and the seated jurors. (See, e.g., *People v. Avila, supra,* 38 Cal.4th at p. 547 [conducting side-by-side comparison of challenged and seated jurors]; *People v. Jurado, supra,* 38 Cal.4th at p. 105 [noting defendant failed to identify "any seated juror who gave responses similar" to the challenged juror]; *People v. Schmeck, supra,* 37 Cal.4th at p. 270 [noting defendant failed to identify "comment by a seated juror that was similar" to the challenged juror's comment]; *People v. Ward, supra,* 36 Cal.4th at p. 203 [engaging in side-by-side comparison of two seated jurors and two challenged jurors].) Finally, even in *Miller-El, supra,* 545 U.S. at pages 239–245, the United States Supreme Court conducted side-by-side comparisons of jurors who were struck, and those who were allowed to serve.

While it is true that neither the United States Supreme Court nor the California Supreme Court has addressed the specific issue before us, viz., whether a record lacking the questionnaires of unseated jurors is sufficient to conduct a comparative juror analysis on appeal,[12] the cases reflect such an

---

[12] We note that in the context of reviewing a trial court's determination that an objector has failed to make a prima facie case, it has been held that an appellate court "should consider the *entire record of voir dire* of the challenged jurors. [Citation.]" (*People v. Gray, supra,* 37 Cal.4th at p. 186, italics added.) Our Supreme Court has determined that this "view is consistent with the high court's recent reiteration of the applicable rules, which require the defendant to attempt to demonstrate a prima facie case of discrimination based on the 'totality of the relevant facts.' (*Johnson v. California, supra,* [545 U.S. at p. 168] [quoting *Batson, supra,* 476 U.S. at pp. 93–94].)" (*People v. Gray, supra,* 37 Cal.4th at p. 186.)

analysis is not conducted in a vacuum. In other words, when conducting a comparative juror analysis, reviewing courts have examined the record in light of the prosecutor's proffered reasons for challenging specific jurors. (See, e.g., *Miller-El, supra,* 545 U.S. at pp. 241–249 [views on death penalty and possibility of rehabilitation]; *People v. Avila, supra,* 38 Cal.4th at p. 547 [negative personal experience with police causing juror to question the veracity of police officers]; *People v. Jurado, supra,* 38 Cal.4th at p. 105 [arrest and prosecution for drugs coupled with negative feelings against prosecutors].) Here, while the prosecutor asserted various reasons for challenging the jurors in question, the overarching theme was concern about bias against the police, caused by personal experiences, which would affect the jurors' ability to judge fairly the testimony of police officers. The record reflects that during voir dire, the trial court permitted both attorneys considerable latitude in exploring a prospective juror's views about the police. The attorneys were free to read questions on a prospective juror's questionnaire and the prospective juror's written response, and then ask the prospective juror to explain his or her written response. Thus, the salient material from the lost juror questionnaires survives in the reporter's and clerk's transcripts through quotation and paraphrase.

To the extent defendant contends that the absence of questionnaires from the entire venire prevents a statistical analysis, we note that the *Miller-El* court found such bare statistical evidence to be not as compelling as the actual side-by-side comparisons of challenged jurors and seated jurors. (*Miller-El, supra,* 545 U.S. at p. 240.) Additionally, we find nothing in *Miller-El* or subsequent California Supreme Court precedent as requiring an analysis of the "six factual questions" proffered by defendant.

Accordingly, we confine our review to whether the prosecutor here honestly found pertinent and legitimate dissimilarities between the challenged jurors (Juror Nos. 70, 81, and 7) and the seated jurors. (See, e.g., *People v. Avila, supra,* 38 Cal.4th at p. 547; *People v. Jurado, supra,* 38 Cal.4th at p. 105; *People v. Schmeck, supra,* 37 Cal.4th at pp. 270–271; *People v. Ward, supra,* 36 Cal.4th at p. 203.) The trial court and all counsel read the jurors' questionnaires. There was no dispute below as to the contents of the jurors' questionnaires. Accordingly, the actual questionnaires from Jurors Nos. 70, 81, and 7 are not necessary to permit us to provide adequate and effective review of defendant's *Batson-Wheeler* claim.[13]

---

[13] Quoting the concurring opinion in *Hardy v. United States* (1964) 375 U.S. 277, 288 [11 L.Ed.2d 331, 84 S.Ct. 424], defendant argues that "[a]nything short of a complete transcript is incompatible with effective appellate advocacy." There, an indigent defendant had been denied a complete *trial* transcript. (*Ibid.*) Here, the record includes a complete transcript of the voir dire proceedings.

In sum, we conclude that the existing record is sufficient to permit review,[14] and defendant is not prejudiced by the absence of the questionnaires from the unseated jurors.[15] (*People v. Ayala, supra,* 24 Cal.4th at pp. 260–270; *People v. Alvarez, supra,* 14 Cal.4th at p. 196, fn. 8; see also *People v. Haley, supra,* 34 Cal.4th at pp. 305–306; *People v. Ayala, supra,* 24 Cal.4th at pp. 269–270; *People v. Heard* (2003) 31 Cal.4th 946, 970 [4 Cal.Rptr.3d 131, 75 P.3d 53].)

C. *The Trial Court Did Not Err in Denying Defendant's Batson-Wheeler Motion*

1. *The Trial Court Followed the Proper Procedure in Ruling on the Motion*

Defendant argues that the trial court did not follow "now-required" procedures in ruling on his *Batson-Wheeler* motion and that remand is required. According to defendant, after the prosecutor gave her reasons for dismissing the jurors in question, the trial court "should have then asked the defense for further proof of discriminatory purpose, including comparative . . . analysis using the questionnaires of the unsworn jurors and the timing of the juror challenges." Defendant's assertions are contrary to both fact and law.

First, the record reflects that the trial court did give defense counsel an ample opportunity to make further argument after the prosecutor gave her reasons for challenging the three African-American jurors. The record further reflects that, at least as to Juror No. 70, defense counsel presented a comparative analysis, albeit a minimal one.

Second, the cases cited by defendant do not support remanding the instant case.[16] In *People v. Johnson* (2006) 38 Cal.4th 1096, 1101–1102 [45 Cal.Rptr.3d 1, 136 P.3d 804], our Supreme Court remanded the case to the trial court to conduct the second and third *Batson* steps. Similarly, the cases defendant relies on from the Ninth Circuit were also remanded for further proceedings due to *Batson* error occurring at the first step. (See *Williams v.*

---

[14] By reason of our conclusion that the record is sufficient to permit review of defendant's *Batson-Wheeler* claim, we do not address his alternate claim of ineffective assistance of counsel for failure to preserve the record.

[15] Of course, the better practice is for county clerks to retain *all* of the juror questionnaires whenever a *Batson-Wheeler* motion has been made, or at least the questionnaires of prospective jurors who were called to the box and questioned.

[16] We note that defendant's reply brief commences with the assertion that remand is not an adequate remedy because the lost juror questionnaires "prevent the trial court from re-visiting the merits of the original motion." However, elsewhere, defendant asserts that "[a]t a minimum, the case must be remanded to the trial court to allow it to comply with the high court rulings in *Johnson* and *Miller-El*."

*Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110 & fn. 14; *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083, 1093; *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073, 1080.)

The instant case is distinguishable from the cases cited by defendant. Here, the trial court determined that defendant had made a prima facie case, then required the prosecutor to state her reasons for exercising her peremptory challenges, and finally gave defense counsel an opportunity to rebut the prosecutor's stated reasons, before ruling on the motion. On this record, remand is not required, as there are no further proceedings to be conducted.

Finally, contrary to defendant's assertion, the "now-required" *Batson-Wheeler* procedures do not require a trial court to review "all [of] the questionnaires, including those of the unchallenged jurors."[17] *People v. Jurado, supra,* 38 Cal.4th 72, cited by defendant, does not require the trial court to undertake such an analysis. There, our Supreme Court reviewed the record of voir dire, in which the prosecutor cited to the juror questionnaires, and noted that the record supported the prosecutor's assertions. (*People v. Jurado, supra,* 38 Cal.4th at pp. 105–107.) Moreover, nothing in *People v. Jurado* indicates that the Supreme Court reviewed and compared all of the questionnaires. Rather, the court noted that even if it assumed it must conduct a comparative juror analysis for the first time on appeal, the defendant had not identified any seated juror who gave responses similar to the challenged juror. (*Id.* at p. 105.)

*People v. Jurado,* like the instant case, involved the third *Batson-Wheeler* step. There, the Supreme Court emphasized, "When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard." (*People v. Jurado, supra,* 38 Cal.4th at pp. 104–105.) Applying this deferential standard of review, we conclude the trial court properly denied defendant's *Batson-Wheeler* motion.

### 2. *Substantial Evidence Supports the Trial Court's Ruling*

Assuming without deciding that we are required to conduct a comparative juror analysis, we do so. Having reviewed the entire record of voir dire,

---

[17] To the extent defendant impliedly asserts that a trial court is now required to conduct a comparative juror analysis on its own motion, this contention is without merit. "Certainly, the trial court should consider obvious matters, and it can consider any other circumstances it finds relevant in the particular case. But, midtrial, we cannot expect, and do not demand, trial courts to engage sua sponte in the sort of comparative juror analysis that appellate lawyers and courts can do after scouring the often lengthy appellate record during the appeal." (*People v. Johnson, supra,* 30 Cal.4th at p. 1323.)

including the questionnaires of the seated jurors, we find nothing that entitles defendant to relief.

Regarding Juror No. 70, the prosecutor provided the following reasons for excusing her: (1) she had just served on a jury in a burglary case a little over a year before the instant case, and stated that she preferred not to serve; (2) she stated on the questionnaire that the first thought that came to mind when she thought of police was "racial profiling," and (3) she was chewing gum during voir dire, which the prosecutor believed showed a lack of respect for the court.

At trial, defense counsel argued that other unchallenged jurors, specifically Juror Nos. 39 and 76, stated that there were good and bad officers. However, when Juror No. 39 was questioned by the trial court, she stated that she had only "good experiences" with police officers. Juror No. 39 also wrote "security" in her questionnaire, as the first thing that came to mind regarding police officers. While it is true that Juror No. 76, as well Juror No. 74, acknowledged in their questionnaires that some police officers could be bad, they also included positive comments about police officers protecting the community. Additionally, both Juror Nos. 76 and 74 stated that they had not had any negative experiences with police officers.

Defense counsel also argued below that Juror Nos. 79 and 22 may have problems with police officers. In her juror questionnaire, Juror No. 79 indicated that a friend who was mugged reported that the police officer was not sympathetic or helpful. She also indicated that a friend's home was damaged and ransacked when her son's friend was found dead. Juror No. 79 did not list any personal experiences with police officers that were negative and stated that "public service" and "dangerous situations" were the first things that came to mind when thinking of police officers. Additionally, the record reflects that Juror No. 22 had no negative experiences with police officers.

Moreover, no seated juror stated that "racial profiling" was the first thing that came to mind when thinking of the police. In fact, the responses of the seated jurors about the police were overwhelmingly positive.

Additionally, while Juror No. 63 had given various reasons for why she did not want to serve, she did not state any negative bias about the police. Rather, she expressed "hatred" for criminal defendants, because her husband had been murdered in the Philippines. On appeal, defendant argues that Juror

No. 15,[18] a sworn alternate, expressed some reluctance in serving in this case. Juror No. 15 had previously served on juries in 1999 and 2002, but, unlike Juror No. 70, she did not ask to be excused from jury service in the instant case. Rather, Juror No. 15 expressly stated that it was part of her civic duty to serve.[19] Juror No. 15 also did not express any negative feelings about the police.

■ Finally, the fact that defense counsel did not think that gum chewing was disrespectful does not call into question the credibility of the prosecutor's reasons for excusing Juror No. 70. (See *United States v. Power* (9th Cir. 1989) 881 F.2d 733, 740 [peremptory challenge of African-American juror upheld, where juror had recently completed service on another jury and was fidgeting].) A prosecutor's explanations need not rise to the level of justifying a challenge for cause. (*Batson, supra,* 476 U.S. at pp. 97–98; *Wheeler, supra,* 22 Cal.3d at pp. 274–276.) "Rather, adequate justification . . . may be no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for race prejudice' [citation]." (*People v. Williams* (1997) 16 Cal.4th 635, 664 [66 Cal.Rptr.2d 573, 941 P.2d 752].) It is important to remember the legitimate bases for peremptory challenges, which include various factors that suggest the possibility of prodefense or proprosecution bias. "For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority." (*Wheeler, supra,* 22 Cal.3d at p. 275.) As *Wheeler* elaborated, such factors may be less focused on the background or basic impression of a potential juror, but more commonly involve a "gut feeling" or the seat-of-the-pants subjectivity of prosecutors and defense attorneys alike. "Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' [citation]—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him." (*Ibid.*)

---

[18] The reporter's transcript references Juror No. "13" instead of "15." However, when comparing the voir dire transcript with the juror questionnaires, it is clear that the juror being questioned by the prosecutor is Juror No. 15.

[19] The prosecutor's questioning regarding Juror No. 15's prior jury service is as follows: "Q. If you have to serve a third time, will that be a problem for you? [¶] A. I guess not. It's my duty to do it. [¶] Q. You'd rather not? [¶] A. I'd rather not. Here and work. It is hard, but it's my duty as a citizen. I have no choice."

The prosecutor's reasons for excusing Juror No. 70 were neither contradicted by the record nor inherently improbable. (See *People v. Avila, supra*, 38 Cal.4th at pp. 547–548 [prosecutor believed challenged juror's personal experience with police caused the juror to question the veracity of police officers]; *People v. Turner* (1994) 8 Cal.4th 137, 171 [32 Cal.Rptr.2d 762, 878 P.2d 521], disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344] [prosecutor's peremptory challenges based on prospective juror's negative experience with law enforcement upheld]; see also *People v. Ward, supra*, 36 Cal.4th at p. 205.) Substantial evidence supports the trial court's finding on the credibility of the prosecutor's explanations. (*People v. Huggins, supra*, 38 Cal.4th at p. 233; *People v. Jurado, supra*, 38 Cal.4th at p. 105.)

With respect to Juror No. 81, the prosecutor explained that she challenged her because: (1) she had been "very critical" of how the Oakland Police Department had handled the investigation of her domestic violence issues; and (2) she failed to answer questions on the questionnaire. The prosecutor stated that based upon Juror No. 81's answers, she was concerned that the juror would judge the Oakland police more harshly. While it is true that Juror No. 76 also skipped a question on the questionnaire, neither she nor any of the seated jurors answered questions in a manner that raised concerns about their ability to assess the credibility of police officers who might testify in the case.

The record reflects that the prosecutor peremptorily challenged Juror No. 19, who in response to the prosecutor's question about Oakland police officers, stated, "Oakland Police Officers have been known to be very corrupt." The record further reflects that the prosecutor did not challenge Juror No. 34, a Hispanic man, whose brother-in-law was killed while in police custody in Modesto. When asked in the questionnaire to comment about the fairness and effectiveness of the criminal justice system, Juror No. 34 wrote, "I believe we have the best system in the world today." He thought of "safety" when thinking about police officers. And "good lawyer" came to Juror No. 34's mind when thinking about prosecutors.

Finally, the fact that Juror No. 81 said that she could set aside her feelings about the Oakland Police Department does not call into question the credibility of the prosecutor's reasons for excusing her. The record reflects that Juror No. 81 was somewhat equivocal about whether she could put aside her negative feelings, first stating that she was not sure if her past experiences with the Oakland Police Department would affect her ability to be fair and impartial. Upon further questioning by the court, Juror No. 81 stated her past experiences "probably wouldn't" affect her ability to evaluate the testimony of Oakland police officers who might testify.

The record reflects that the prosecutor peremptorily challenged Juror No. 26, a White woman, who gave similarly equivocal responses. Juror No. 26 stated that she had been a victim of domestic violence for approximately seven years. Juror No. 26 said she was "ambivalent" about the district attorney's choice to not prosecute the case. However, her feelings about law enforcement, in general, were "mixed."

The prosecutor was not required to believe Juror No. 81's assertion that she could set aside her feelings about the Oakland Police Department. (See *People v. Avila, supra*, 38 Cal.4th at pp. 554–555 [record established numerous reasons other than racial bias for challenging juror, notwithstanding juror's assurances that prior experiences would not carry over to trial].) The prosecutor's reasons for excusing Juror No. 81 were neither contradicted by the record nor inherently improbable. (*People v. Ward, supra*, 36 Cal.4th at p. 205.) Substantial evidence supports the trial court's finding on the credibility of the prosecutor's explanations. (*People v. Huggins, supra*, 38 Cal.4th at p. 233; *People v. Jurado, supra*, 38 Cal.4th at p. 105.)

As to Juror No. 7, although the trial court did have some reservations about the prosecutor's reasons for challenging this juror, substantial evidence supports the trial court's ultimate denial of defendant's *Batson-Wheeler* motion. The prosecutor stated that she challenged Juror No. 7 because: (1) multiple members of her family had been arrested by the Oakland Police Department; (2) her son, who had been arrested by the Oakland Police Department for assault, was the same age as defendant; (3) she stated that the first thing that comes to mind when she thinks of the police is "trouble"; and (4) she stated that the first thing that comes to mind when she thinks of defense attorneys is "make the right decision."

The record reflects that no seated jurors had immediate family members with multiple arrests by the Oakland Police Department. Although Juror No. 7 stated that she felt her brother and sister had been treated fairly, the prosecutor believed that she was more defensive about her son's arrest and conviction. From the cold record before us, we cannot determine the tone or manner in which Juror No. 7 answered questions about her son. "The trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere. And the trial judge is best placed to determine whether, in a borderline case a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision." (*Rice v. Collins, supra*, 546 U.S. at p. 343 [126 S.Ct. at p. 977] (conc. opn. of Breyer, J.).)

Defense counsel argued below that it was only natural that Juror No. 7 would view her son's case differently, and that she nonetheless stated that she

felt she could be fair. However, given the number of Juror No. 7's relatives who were arrested by the Oakland Police Department and thereafter convicted, it was not unreasonable for the prosecutor to be skeptical. (See *People v. Avila, supra*, 38 Cal.4th at pp. 554–555; see also *People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988] ["close relative's adversary contact with the criminal justice system" reasonable grounds for prosecutor's challenge]; *Wheeler, supra*, 22 Cal.3d at p. 277, fn. 8 [prospective juror's stepson's conviction "deemed to give rise to a significant potential for bias against the prosecution"]; *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1690 [43 Cal.Rptr.2d 129] [valid grounds for challenging jurors whose relatives and/or family members had negative experiences with criminal justice system]; *People v. Allen* (1989) 212 Cal.App.3d 306, 314–316 [260 Cal.Rptr. 463] [valid grounds for challenging jurors included having relatives or close friends who have been arrested].) Additionally, citing *People v. Moss, supra*, 188 Cal.App.3d 268, the prosecutor asserted that Juror No. 7 might be sympathetic towards the defense, because her son was 44 years old, which was about the same age as defendant. There, as here, a prosecutor proffered numerous reasons for challenging a prospective juror, including the fact that she had sons who were the approximate age of the defendant. (*Id.* at p. 280.) The appellate court determined that the prosecutor's alternate reason for challenging the prospective juror based on the ages of her sons did "not survive analysis[, as] three unchallenged jurors (two women and one man) also had sons the same age." (*People v. Moss, supra*, 188 Cal.App.3d at pp. 280–281.) Here, unlike in *People v. Moss,* none of the seated jurors had children who were the approximate age of defendant. Additionally, none of the seated jurors had children who had been arrested.

The prosecutor was also concerned about Juror No. 7's responses on her questionnaire regarding the first thing that came to mind regarding police officers ("trouble") and defense attorneys ("make the right decision"). The prosecutor believed that Juror No. 7's responses indicated that she was "clearly defense-oriented" and unable to be fair in this case. The prosecutor was not required to accept Juror No. 7's neutral explanation for these equivocal responses. (See *People v. Avila, supra*, 38 Cal.4th at pp. 554–555.) No seated juror gave similar responses when referring to the police and defense attorneys.

Finally, contrary to defendant's assertion, the record does not reflect that "the judge felt Juror 7 was excused due to her race." Rather, the record reflects that the trial court expressed uncertainty about the prosecutor's challenge of Juror No. 7, which "may reflect the more general fact that, sometimes, no one, not even the lawyer herself, can be certain whether a decision to exercise a peremptory challenge rests upon an impermissible racial, religious, gender-based, or ethnic stereotype. . . . [¶] . . . Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's

decision about likely motivation. These circumstances mean that appellate courts will, and must, grant the trial courts considerable leeway in applying *Batson*. [Citation.]" (*Rice v. Collins, supra*, 546 U.S. at p. 343 [126 S.Ct. at pp. 976–977] (conc. opn. of Breyer, J.).)

The prosecutor's reasons for excusing Juror No. 7 were neither contradicted by the record nor inherently implausible. (*People v. Ward, supra*, 36 Cal.4th at p. 205.) Substantial evidence supports the trial court's finding on the credibility of the prosecutor's explanations. (*People v. Huggins, supra*, 38 Cal.4th at p. 233; *People v. Jurado, supra*, 38 Cal.4th at p. 105.)

We also note that the prosecutor accepted two jurors of African descent: one African immigrant (Juror No. 76), and one African-American (Juror No. 75), "which we find here to be 'an indication of the prosecutor's good faith in exercising [her] peremptories.' (*People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452].)" (*People v. Huggins, supra*, 38 Cal.4th at p. 236.) If the prosecutor were filtering prospective jurors by race, presumably she would have challenged Juror No. 76, an African immigrant. Juror No. 76 stated in her questionnaire that her husband had been arrested for driving under the influence of alcohol. On voir dire, it came to light that Juror No. 76's husband had been recently arrested by Oakland police officers, and that his case was pending in Alameda County Superior Court. She also acknowledged that police officers could be bad, and failed to answer a question on the questionnaire. But Juror No. 76 also stated that police officers "protect the people" and that she "really" appreciated the criminal justice system. Juror No. 75, an African-American woman whom the prosecutor did not challenge, had no prior arrests (self, friends, or family), and provided positive responses regarding her thoughts about police and prosecutors. Plainly, the prosecutor was seeking prospective jurors having a favorable attitude toward her cause, not jurors of a particular race or ethnicity.

In sum, the prosecutor gave reasons demonstrating that she distinguished between jurors she challenged and those she accepted on valid, race-neutral grounds. The trial court accepted those reasons, and substantial evidence in the record supports the ruling. On our own review of the record, we think it is clear that the prosecutor desired jurors who did not have a bias against police officers, rather than jurors of a particular race. The jurors she accepted fit that desire, while those challenged did not. We find no error in the trial court's ruling.[20]

---

[20] Based upon this conclusion, we do not reach defendant's argument regarding ineffective assistance of counsel.

## III. DISPOSITION

The judgment is affirmed.

Reardon, Acting P. J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 2007, S149352. George, C. J., did not participate therein.