Filed 1/7/15  P. v. Scott CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDJUAN CHARDON SCOTT et al.,<br><br>        Defendants and Appellants. | A135873<br><br>(Contra Costa County<br>Super. Ct. No. 51002989) |

Defendants Edjuan Chardon Scott and Renwicke Uranus Lampkin and a third man, Dominique Cole, were involved in a three-day crime spree in August 2008.  The crimes began on August 7 with a carjacking, kidnapping, and robbery of an employee of a check-cashing store in San Pablo, continued the next day with a bank robbery in Pinole, and ended on August 9 after another bank robbery in Antioch.  Defendants and Cole were finally apprehended after a police chase in which Scott fired a machine gun at several officers.

Scott, who was charged with 28 counts, and Lampkin, who was charged with 24, were jointly tried.  The jury convicted Scott of 23 counts, including two counts of carjacking, one count of kidnapping for robbery, seven counts of second degree robbery, and five counts of assault with an assault weapon on a peace officer.[1]  It acquitted

---

[1] These convictions were under Penal Code sections 215, subdivision (a) (carjacking), 209, subdivision (b) (kidnapping for robbery), 211 and 212.5, subdivision (c) (second degree robbery), and 245, subdivision (d)(3) (assault with an assault weapon on a peace officer).  All further statutory references are to the Penal Code unless otherwise noted.

Lampkin of all counts charged against him arising out of the events on August 7 and 8, but it convicted him of 11 counts for his actions on August 9, including four counts of second degree robbery and five counts of assault with an assault weapon on a peace officer.[2]  The jury also found true several firearm-related enhancement allegations against both defendants.

Scott pleaded not guilty by reason of insanity, but he was found to have been sane during the commission of the crimes.  He was sentenced to a determinate term of 112 years, four months in prison and a consecutive indeterminate term of 14 years to life in prison.  Lampkin was sentenced to 21 years and eight months in prison.

Defendants contend that their convictions must be reversed because the trial court improperly denied their *Batson/Wheeler*[3] motion after the prosecutor exercised a peremptory challenge on a prospective juror who was African-American.  Scott also argues that the court abused its discretion by denying his motion to sever the August 7 and 8 counts from the August 9 counts, that he was improperly convicted of false imprisonment by violence because he was also convicted of kidnapping for robbery, and that the court erred by not suspending proceedings during the sanity phase after his trial counsel questioned whether he was still mentally competent.  Lampkin also argues, and the Attorney General concedes, that certain arming enhancements were improperly imposed against him.

We agree with Scott that his conviction for false imprisonment by violence must be reversed and with Lampkin that the contested enhancements must be stricken.  We also order the correction of various clerical errors in both abstracts of judgment.  We otherwise reject defendants' claims and affirm.

---

[2] These convictions were under sections 211 and 212.5, subdivision (c) (second degree robbery) and 245, subdivision (d)(3) (assault with an assault weapon on a peace officer).

[3] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

## I.
### FACTUAL AND PROCEDURAL
### BACKGROUND

Cole, who was charged in a separate case, was the prosecution's key witness at trial.[4]  He testified that he ran into defendants, who are cousins, a few days after he was released from jail in August 2008.  The three men agreed on a plan to rob banks and decided the first step was to steal a getaway car.

On August 7, 2008, Cole stole a Toyota Highlander from V.B. after she pulled into a gas station in Richmond.  Cole testified that as defendants waited in a nearby car, he showed V.B. a handgun Scott had given him, took her keys, and drove the Highlander away.  V.B. generally corroborated Cole's account of the carjacking, although she was unable to identify Cole and was not aware anyone else was involved in the crime.

After the three men reunited, they cased Pinole and Antioch banks in the Highlander.  Scott then suggested they rob a check-cashing store in San Pablo.  They waited until the store closed and the last employee, A.S., drove away in her Honda.  The three pursued A.S. and eventually trapped her Honda in a cul-de-sac.  According to Cole, he approached the Honda, threatened A.S. with the handgun, and forced her to sit in the back of the Honda.  Lampkin sat next to her, and Cole drove the Honda to a nearby abandoned house.  Scott met them there in the Highlander.

Cole gave the handgun back to Scott, who led A.S. into the house's backyard and made her lie face down on the ground.  A.S. gave Scott the keys to the check-cashing store and told him the store's alarm codes after he and Cole threatened to kill her if she did not.  Scott then gave the handgun to Cole and left with Lampkin to rob the store.  Defendants eventually returned and told Cole they had been unable to rob the store because "some . . . guys . . . started chasing them . . . like they [were] waiting there for

---

[4] Cole testified against defendants at the preliminary hearing as part of a deal with the district attorney's office under which he was to receive a sentence of 10 years and eight months.  He recanted on cross-examination, however, and testified at trial that he did so because his child's mother was threatened by one of defendants' relatives.  Cole was not promised anything in exchange for his testimony at trial.

3

them."[5]  The three men told A.S. to wait for 15 minutes and then leave, and they left in the Highlander.

Although A.S. confirmed much of Cole's account, she identified Lampkin as the man who had carjacked her and driven the Honda, not as the man who sat next to her in the back.  All she could remember about the man in the back was that he was young and African-American.  In an earlier photographic line-up, she had identified Scott, who had distinctive short dreadlocks, as the third man present at the abandoned house.[6]

Cole testified that the next day, August 8, the three men drove the Highlander to a Wells Fargo Bank branch in Pinole.  Scott had various disguises in a backpack.  He put on a black and gold mask, and Cole put on a braided wig.  While Lampkin waited in the Highlander, Cole and Scott, who was carrying a machine gun, ran into the bank.  During the robbery, Scott grabbed a woman, C.E., and pointed the gun at her head while threatening to shoot her unless a teller gave him money.  Cole and Scott escaped with several thousand dollars, which the three men split.

Images of Scott, Cole, and the Highlander were captured on security cameras.  Several witnesses testified that one of the bank robbers had a hairstyle like Scott's.  A bank employee who was outside the store during the robbery saw an African-American man waiting in the Highlander, but he was unable to see the man's face or give any further description of him.

According to Cole, he and defendants drove to a Wells Fargo branch in Antioch the next day, August 9, and parked the Highlander outside it.  Scott was carrying the same machine gun, and Cole had the backpack.  They all ran inside, jumped over the

---

[5] A.S. was on her cellular phone with her mother when she was kidnapped.  Her mother alerted A.S.'s son, I.S., who went with his friends to look for A.S.  I.S. eventually spotted his mother's Honda being parked near the check-cashing store.  As he and his friends approached the Honda, at least two African-American men exited it and began running.  I.S. chased one of the men, but he escaped.  I.S. described the man as having shoulder-length "dreads or curly hair," but he was unable to identify the man in a photographic line-up.

[6] Scott refused to attend most of the trial proceedings, and he was not present in court when A.S. testified.

4

counter, and went from teller to teller, demanding money. After they had collected money from several tellers, they left the bank, and Cole drove them away in the Highlander.

A bystander outside saw the men run out of the bank and called the police, who soon began chasing the Highlander. As Cole was entering the freeway, Scott leaned out of the Highlander and fired several shots with the machine gun at the police cars behind them. Eventually, Cole drove over a spike strip placed by the police. The men jumped out of the disabled SUV and ran along the side of a tow yard. Officers pursued them while shouting at them to stop. At one point, Cole saw Scott slow down, turn, and fire the machine gun at a police officer behind him.

The three men ran into the tow yard, where they were cornered and apprehended. Cole and Scott were transported to the police station together, and Scott was recorded in the transport vehicle telling Cole he had shot at the police and planning with Cole to pretend they had been "crazy" during the crimes.

The police recovered the machine gun and approximately $36,000 in cash from the tow yard. They also recovered the backpack, which contained a mask like the one Scott had worn during the Pinole bank robbery. Cash in the amount of $5,000 was later discovered in Scott's room at his mother's house, where Lampkin also lived. A Jeep parked at the residence contained approximately $18,000 in cash.

An information charged both defendants with 24 felony counts and Scott with four additional felony counts.[7] For the events of August 7, both defendants were charged with two counts of carjacking (counts 14 and 16); one count of kidnapping for robbery (count 17); one count of false imprisonment by violence (count 18); and one count of second degree robbery (count 19).[8] As to each of these counts, the information alleged that both

---

[7] In discussing these counts, we reference their assigned numbers to assist the correction of the abstracts of judgment in accordance with our disposition.

[8] These counts were brought under sections 215, subdivision (a) (counts 14 and 16), 209, subdivision (b) (count 17), 236 and 237, subdivision (a) (count 18), and 211 and 212.5, subdivision (c) (count 19).

5

defendants were armed with a firearm.[9]  In addition, Scott was charged with one count of being a felon in possession of a firearm (count 15).[10]

For the events of August 8, both defendants were charged with two counts of second degree robbery (counts 20 and 21); one count of making criminal threats (count 22); and one count of assault with an assault weapon (count 23).[11]  As to each of these counts, the information alleged that Scott personally used a firearm and Lampkin was armed with a firearm.[12]  Scott was also charged with one count of being a felon in possession of a firearm (count 24).[13]

For the events of August 9, both defendants were charged with four counts of second degree robbery (counts 1 through 4); one count of evading a peace officer with willful or wanton disregard for safety (count 5); one count of exhibiting a firearm in the presence of a peace officer (count 6); five counts of assault with an assault weapon on a peace officer (counts 7 and 25 through 28); and four counts of attempted murder of a peace officer (counts 8 through 11).[14]  Lampkin was alleged to have been armed with a firearm in connection with each of these counts except count 5.[15]  Scott was alleged to have personally used a firearm in connection with counts 6 and 7 and to have personally used and intentionally discharged a firearm in connection with counts 1 through 4, 8

---

[9] The arming enhancements were alleged under section 12022, subdivision (a)(1).

[10] This count was brought under former section 12021, subdivision (a)(1).

[11] These counts were brought under sections 211 and 212.5, subdivision (c) (counts 20 and 21), 422 (count 22), and 245, subdivision (a)(3) (count 23).

[12] The personal-use enhancements were alleged under sections 12022.53, subdivision (b) (counts 20 and 21) and 12022.5, subdivision (a)(1) (counts 22 and 23), and the arming enhancements were alleged under section 12022, subdivision (a)(1).

[13] This count was brought under former section 12021, subdivision (a)(1).

[14] These counts were brought under sections 211 and 212.5, subdivision (c) (counts 1 through 4), Vehicle Code section 2800.2, subdivision (a) (count 5), section 417, subdivision (c) (count 6), section 245, subdivision (d)(3) (counts 7 and 25 through 28), and sections 187, subdivision (a) and 664, subdivision (e) (counts 8 through 11).

[15] These arming enhancements were alleged under section 12022, subdivision (a)(1).

6

through 11, and 25 through 28.[16]  Scott was also charged with one count of being a felon in possession of a firearm (count 12) and one count of possessing an assault weapon (count 13).[17]  In addition, the information alleged that he had a prior strike and three prior convictions resulting in a prior prison term.[18]

A jury found Scott not guilty of the August 7 count of being a felon in possession of a firearm (count 15) and Lampkin not guilty of all the August 7 and 8 counts and accompanying enhancements brought against him (counts 14 and 16 through 23).  It also found untrue the August 7 arming allegations against Scott.  It was unable to reach a verdict as to either defendant on all the attempted murder counts, and the trial court declared a mistrial on them.  Defendants were convicted of the remaining counts and accompanying enhancements,[19] and the jury found true that Scott had suffered the alleged prior convictions.

During the sanity phase of the trial, Scott presented evidence that he had a chaotic upbringing marked by domestic violence and his mother's addiction to crack cocaine.

---

[16] The count 6 personal-use enhancement was alleged under section 12022.5, subdivision (a)(1), and the count 7 personal-use enhancement was alleged under section 12022.53, subdivision (b).  The personal-use-and-intentional-discharge enhancements were alleged under section 12022.53, subdivisions (b) and (c).

[17] Count 12 was brought under former section 12021, subdivision (a)(1), and count 13 was brought under former section 12280, subdivision (b).

[18] The strike was alleged under sections 667 and 1170.12, and the prior convictions with a prison term were alleged under section 667.5, subdivision (b).

[19] The verdict form for the personal-use enhancement against Scott accompanying count 7 (assault with an assault weapon on a peace officer) erroneously referred to section 12022.5, subdivision (a) instead of the statute under which the enhancement was alleged, section 12022.53, subdivision (b).  Both statutes impose additional penalties for the same conduct of "personally us[ing] a firearm" while committing specified crimes, however, and the jury was instructed on personal use of a firearm without reference to either statute.  (§§ 12022.5, subd. (a), 12022.53, subd. (b).)  It appears the verdict form's reference to section 12022.5 was a clerical error, and we therefore conclude that the enhancement accompanying count 7 was properly imposed under section 12022.53, subdivision (b).  (See *People v. Trotter* (1992) 7 Cal.App.4th 363, 369-370 [trial court "authorized to make clerical corrections" to personal-use enhancement verdict form referencing incorrect statute after verdict returned].)

One of his sisters testified he had once had a seizure.  She and another sister also testified he had "[o]utbursts" and a "breakdown" after he returned from being incarcerated for a juvenile offense.  An expert witness for the defense testified Scott had "[s]ignificant mental illness" and was not legally sane during the August 9 crimes, while the prosecution's expert witness testified that Scott was sane during the crime spree and was likely malingering.  The trial court granted the People's motion for a directed verdict that Scott was sane during the commission of the August 7 and 8 crimes, and the jury found he was legally sane during the commission of the August 9 crimes.

Scott was sentenced to a total determinate term of 112 years and four months in prison and a consecutive indeterminate term of 14 years to life in prison for the kidnapping conviction (count 17).[20]  The determinate term was comprised of a term of 24 years for count 25 and a consecutive term of 20 years for the accompanying enhancement; seven consecutive two-year terms for counts 1 through 4 and 19 through 21, plus two consecutive terms of three years and four months each for enhancements accompanying counts 20 and 21; consecutive six-year terms for counts 7, 26, and 27, plus two consecutive terms of six years and eight months each for the enhancements accompanying counts 26 and 27 and one consecutive term of three years and four months

_____

[20] Scott's abstract of judgment contains several clerical errors.  First, the count 19 conviction was for second degree robbery under sections 211 and 212.5, subdivision (c), not carjacking under section 215, subdivision (a).  Second, the abstract of judgment reflects that the enhancements for counts 7 and 23 were imposed under section 12022.53, subdivisions (b) and (c), but the count 7 enhancement was found true under section 12022.53, subdivision (b) (as discussed in fn. 19 above) and the count 23 enhancement was found true under section 12022.5, subdivision (a)(1).  Third, the enhancements for counts 20 and 21 were found true under section 12022.53, subdivision (b), not section 12022.53, subdivisions (b) and (c).  Fourth, the trial court stayed enhancements under section 12022.5, subdivision (a)(1) for counts 6 and 22 that are not included on the abstract of judgment.  Fifth, the abstract of judgment reflects that a concurrent term of six years and eight months was imposed for count 28, but the court actually imposed a concurrent term of six years.  Finally, the enhancement for count 28 was found true under section 12022.53, subdivisions (b) and (c), not just subdivision (b).  We order the abstract of judgment corrected to fix these errors.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.)

for the enhancement accompanying count 7; a consecutive term of five years and four months for count 23, plus a consecutive term of one year and four months for the accompanying enhancement; a consecutive term of three years and four months for count 14; and three one-year terms for the prior convictions resulting in a prior prison term.[21]

Lampkin was sentenced to a total term of 21 years and eight months in prison.[22] This sentence was comprised of a term of 12 years for count 25 with a consecutive one-year term for the accompanying enhancement, a consecutive term of three years for count 26 with a consecutive four-month term for the accompanying enhancement, and four consecutive one-year terms for counts 1 through 4 with a consecutive four-month term for each of the accompanying enhancements.[23]

## II.
### DISCUSSION

*A.     Defendants'* Batson/Wheeler *Motion Was Properly Denied.*

Defendants are African-American. They claim that their convictions must be reversed because the trial court erroneously denied their *Batson/Wheeler* motion after the prosecutor exercised a peremptory challenge on an African-American prospective juror, S.M. We conclude that the court properly found that defendants failed to make a prima

---

[21] Scott was also sentenced to four concurrent terms of one year and four months each for counts 5, 12, 18, and 24, a concurrent term of three years and four months for count 16, and a concurrent term of six years for count 28. Sentences for counts 6, 13, and 22 and for the enhancements accompanying counts 1 through 4 were stayed.

[22] Lampkin's abstract of judgment also contains clerical errors. It reflects a concurrent term of four months for count 6 instead of the eight months the trial court imposed. In addition, it reflects that the four-month terms for the enhancements accompanying counts 1 through 4 were part of the main term instead of separate enhancements under section 12022, subdivision (a)(1). Again, we order the abstract of judgment corrected to fix these errors. (*People v. Mitchell*, *supra*, 26 Cal.4th at pp. 185-186.) In part II.E. of the opinion, we address additional errors related to the enhancements for counts 6, 7, and 25 through 28.

[23] Lampkin was also sentenced to concurrent terms of eight months for count 5, eight months for count 6 and four months for the accompanying enhancement, and three years each for counts 7, 27, and 28 and four months for each accompanying enhancement.

facie showing that the prosecutor had a racially discriminatory purpose in challenging S.M.

In his juror questionnaire, S.M. wrote that he had an adult child with a "handicap." When the trial court asked him during voir dire whether his child's disability was "physical" or "mental," he responded, "It's mental. [¶] . . . [¶] . . . [F]rom 10 months she had multiple seizure disorders."

Another prospective juror, J.R., disclosed he had "a close friend who is bipolar, under medication and has a criminal record." When questioning J.R., the prosecutor said, "I'm concerned that since . . . Scott . . . has pled not guilty by reason of insanity and is going to claim some mental health issue, that you might feel some sympathy for that particular defendant because you might be thinking about your friend and how he has mental health issues . . . . [¶] . . . Should I be concerned about that at all?" J.R. responded, "Well, it could actually go either way," explaining that he thought pleading not guilty by reason of insanity "could . . . be a possible excuse for avoiding responsibility for [one's] choices" but also felt sympathy toward his friend. When asked a similar question, S.M. responded, "I'm neutral on whatever, I got to hear what's . . . being said about the defendant," and he agreed with the prosecutor that he, like J.R., felt "it could go either way." Under additional questioning by the trial court, both men stated they could set aside any sympathy they felt and be fair.

Later, Scott's trial counsel asked whether any of the prospective jurors had "resistance . . . to dealing with psychologists or psychiatrists or hearing expert opinion testimony of that kind in a criminal case." J.R. responded, "[My friend] doesn't have a lot of good things to say about the psychiatric community. [¶] . . . [¶] . . . I don't know if that would bias me or not, but . . . it's been a long struggle for him. . . . And then he's looking for understanding and compassion . . . from the counselors and doesn't always get that. And . . . I hear all of that." S.M. did not volunteer anything in response to Scott's counsel's questions about mental-health issues.

Midway through jury selection, Scott repeatedly interrupted his trial counsel as she was questioning prospective jurors. The trial court had the jurors leave the courtroom,

10

and Scott was taken away at his own request. Later that day, the prosecutor exercised a peremptory challenge against J.R. but passed on S.M., and S.M. remained in the jury pool.

The next morning, another prospective juror, J.P., asked to speak to the trial court in chambers. He disclosed that his minor child was "seeing a psychiatrist because of some anxiety issues" arising from an autism disorder. J.P. stated that Scott's "outburst" the previous day had "provoked an emotional response towards . . . Scott" that might "color [J.P.'s] judgment," and J.P. was concerned his emotional response would make it hard for him "to sit in the courtroom and pay attention to the facts." After further questioning, the court decided to excuse J.P.

Later that day, after the trial court decided to excuse another prospective juror who expressed doubts about "follow[ing] the law . . . with respect to mental health issues," the prosecutor gave notice he intended to exercise a peremptory challenge against S.M. The prosecutor stated, "I'm concerned because he has a child that has mental health issues. [¶] And I know a number of jurors have voiced and expressed [the] opinion that they might not be fair . . . [in] a case involving mental health issues. That's my proffered reason for excusing him. [¶] I know [S.M.] is an African-American male adult, and there's a potential *Batson/Wheeler* challenge, so . . . if any challenge would be made, we could litigate that issue at this point."

Lampkin then made a *Batson/Wheeler* motion, which Scott joined. This prompted the prosecutor to explain further that, although he "was not initially concerned about [S.M.] and . . . passed on him," he had reconsidered after "Scott started to act up [and] additional jurors . . . voiced their concerns about their . . . friends or relatives who have mental health issues." The prosecutor said, "I think it is a bad idea for me to keep an individual who has a child with a mental health issue on this jury because I anticipate . . . some sort of mental defense and there's going to be a sense of sympathy or empathy."

Lampkin's trial counsel objected that "it's too categorical to say anybody who has a child with mental health problems could be disqualified in this case. . . . [¶] . . . [¶] I don't remember exactly what [S.M.] said, but it didn't come out in any kind of questions

11

of him . . . that that would affect [him]." Scott's trial counsel observed that none of the other potential jurors then seated appeared to be African-American, "[s]o the effect of the challenge is to leave the panel with no members of [defendants'] racial group." The next day, the prosecutor exercised a peremptory challenge to excuse S.M., and the trial court denied the *Batson/Wheeler* motion.

The trial court made a record of its decision several weeks later. It observed that the jury ultimately seated had no African-American members, although some members were "people of color." There had been other "African-American individuals and other individuals of color in [the] jury [venire]," and "most of the African-Americans were . . . excluding themselves from the panel because of incidents that had happened to them and indicating to the court they could not be objective in this kind of a case." The court noted that after J.P. was excused and the prosecutor gave notice of his intent to exercise a peremptory challenge against S.M., the prosecutor explained his reasons for challenging S.M. "without any prompting by the court indicating that there had been a [*Batson/Wheeler*] prima facie case made." It also stated that the prosecutor had also exercised a peremptory challenge to another prospective juror who had a family member with mental health issues, "consistent with [the prosecutor's] expressed concern about leaving jurors on the panel who had family members or children with mental health issues."[24] Finally, the court explained it had denied the motion because "there was not a prima facie case made that [the prosecutor] was challenging the African-American juror for other than race[-]neutral reasons."

The use of peremptory challenges to remove prospective jurors based only on their race violates the federal and state Constitutions and state statutory law. (*People v. Duff* (2014) 58 Cal.4th 527, 544; Code Civ. Proc., § 231.5.) Claims that peremptory challenges have been impermissibly exercised based on race require a three-step analysis. (*People v. Chism* (2014) 58 Cal.4th 1266, 1313.) " 'First, the trial court must determine

---

[24] It is not clear whether the trial court was referring to J.R. or another prospective juror. We note that several other prospective jurors who disclosed they had family or friends with mental health issues were excused for cause.

whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " (*Ibid.*)

" ' " ' "[A] defendant satisfies the requirements of [*Batson/Wheeler*]'s first step by providing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." ' " ' " (*People v. Mai* (2013) 57 Cal.4th 986, 1048.) "When reviewing the denial of a first stage *Batson/Wheeler* inquiry, we sustain the trial court's ruling if, upon our independent review of the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose." (*People v. Montes* (2014) 58 Cal.4th 809, 854.)

We agree with the trial court that a prima facie case of racial discrimination was not made.  The prosecutor's stated reason for challenging S.M.—that his daughter had mental health issues and he might be sympathetic to Scott—does not give rise to an inference that the prosecutor had a racially discriminatory purpose.[25]  (See, e.g., *People v. Watson* (2008) 43 Cal.4th 652, 674-675 [affirming denial of *Batson/Wheeler* motion where prospective juror's "voir dire answers . . . suggested she might be overly sympathetic to an individual with [the] defendant's background"].)  This was especially so since several other prospective jurors with similar relationships said they were not sure they could overlook those relationships in evaluating the case.  Indeed, the prosecutor initially passed on S.M. and only challenged him after Scott's behavior in court caused another juror to voice his concerns.  Moreover, it appears that none of the jurors who disclosed close relationships with people with mental health issues remained on the jury,

---

[25] Defendants do not argue that the prosecutor's reason for challenging S.M. was itself discriminatory, and we express no opinion on the permissibility of exercising peremptory challenges to exclude prospective jurors based solely on their association with people who have mental health issues.

13

and most of, if not all, the other African-American members of the jury pool were excused for cause. The totality of the circumstances does not raise an inference that S.M. was challenged for a racially discriminatory reason.

Defendants argue that "the prosecutor's stated reason for excusing [S.M. was] not sufficiently plausible to withstand constitutional scrutiny" because while S.M.'s daughter's condition apparently involved "a brain dysfunction, [it was] not the same variety or nature of disability mentioned by some of the other potential jurors—i.e., bipolar disorder, schizophrenia, or autism—which concerned the prosecutor because of the anticipated mental disability defense[]." But although S.M. did not describe his daughter's condition in detail, he characterized it as a "mental" disability rather than a "physical" one. The prosecutor could have reasonably concluded that having a daughter with a mental disability might affect S.M.'s feelings toward Scott, even if the disability was not fully described or was somewhat different from the other conditions described.

Defendants also claim that a racially discriminatory purpose may be inferred because, unlike J.R. and J.P., S.M. "never wavered from his position that he would base his verdicts 'on the law and the facts' " and "could be fair." But the prosecutor was not required to accept S.M.'s assurances. (See *People v. Avila* (2006) 38 Cal.4th 491, 554-555; *People v. Jordan* (2006) 146 Cal.App.4th 232, 258.) And, although defendants imply otherwise, the prosecution had no burden to "return[] to question [S.M.] as to whether Scott's courtroom interruption might affect him in some way due to his daughter's condition." We conclude that the totality of the circumstances does not give rise to an inference that the prosecutor exercised the peremptory challenge on the basis of S.M.'s race.

B.     *The Trial Court Properly Denied Scott's Motion to Sever.*

Scott contends that the trial court abused its discretion by denying his motion to sever. We disagree.

14

Before trial, Scott moved to sever the August 7 and 8 counts from the August 9 counts.[26] He argued that his insanity defense to the August 9 counts was inconsistent with his identity defense to the August 7 and 8 counts and that severance was required because he wanted to testify that he was not involved in the August 7 and 8 crimes but did not want to testify about the August 9 crimes. The prosecution responded that the motion should be denied because much of the evidence about all three days was cross-admissible, including Cole's testimony, the Highlander, the machine gun, the black and gold mask, and the cash found at Scott's mother's residence.

The trial court denied the motion. It found "no question that there is cross-admissibility of the evidence, and there is more than just a little bit." It also found that judicial economy favored a single trial. Finally, it noted the case involved two defendants and "there [was] absolutely no legal reason" for severance of Lampkin's case. Addressing the concern that Scott would be forced to testify about the August 9 charges, the court stated he could "just take the Fifth and not testify as to those counts."

Joinder of crimes for trial is permitted by section 954, which provides, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses, under separate counts." (§ 954; *People v. Soper* (2009) 45 Cal.4th 759, 771-772 (*Soper*).) A trial court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (§ 954.)

Scott apparently concedes that the counts were joined in accordance with the terms of section 954, but he argues that severance was required because of the joinder's prejudicial effect. A defendant seeking severance on this basis has the burden to show " 'a substantial danger of undue prejudice' " that outweighs " 'countervailing considerations [of efficiency and judicial economy].' " (*Soper*, *supra*, 45 Cal.4th at

---

[26] Lampkin neither joined in nor objected to the motion.

15

p. 773, italics omitted.)  The first step in our evaluation of the trial court's ruling is to "consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.]  If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges."  (*Id.* at pp. 774-775.)  Only "[i]f we determine that evidence underlying properly joined charges would *not* be cross-admissible [do] we proceed to consider" the issue whether a substantial danger of prejudice outweighs countervailing considerations in favor of joinder.  (*Id.* at pp. 775, italics in original.)

We review the trial court's ruling for an abuse of discretion.  We consider the record before the court at the time it ruled and do not disturb the ruling unless it " ' " ' " 'falls outside the bounds of reason.' " ' " ' "  (*Soper*, *supra*, 45 Cal.4th at p. 774.)

The trial court found there was significant cross-admissible evidence here, and Scott does not disagree.  Instead, he argues that the court's ruling "effectively prevented him from testifying and presenting a fully developed defense to all the counts," violating his federal constitutional rights to due process and to testify in his own defense.  But he does not explain why we should proceed to the second step of the analysis under *Soper* despite the finding of cross-admissibility (see *Soper*, *supra*, 45 Cal.4th at p. 775), and the applicable authority indicates we should not.  In a decision rejecting a similar claim of prejudice based on a defendant's desire to testify about some counts but not others where the evidence was *not* cross-admissible, our state Supreme Court indicated it would not have considered the prejudice issue if the evidence had been cross-admissible.  (*People v. Thomas* (2012) 53 Cal.4th 771, 798, 800.)  We conclude that the trial court properly denied the motion to sever because of the cross-admissibility of the evidence.

C.    *Scott Could Not Be Convicted of False Imprisonment by Violence After Being Convicted of Kidnapping for Robbery.*

Scott argues that his conviction of false imprisonment of A.S. by violence must be reversed because it is a lesser included offense of kidnapping A.S. for the purpose of robbery, a crime for which he was also convicted.  We agree.

16

" 'In general, a person may be convicted of, although not punished for, more than one crime arising out of the same act or course of conduct.' " (*People v. Sloan* (2007) 42 Cal.4th 110, 116, italics omitted; see § 954.)  Scott relies on an exception to this rule, which " ' "prohibits multiple convictions based on necessarily included offenses." ' " (*Sloan*, at p. 116.)  "When a defendant is found guilty of both a greater and a necessarily included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)

Initially, the Attorney General contends that Scott forfeited this claim because he failed to raise it below.  She relies on *People v. Stanfill* (1999) 76 Cal.App.4th 1137, which held that a defendant forfeits a claim of being improperly convicted "of a time-barred lesser included offense where the charged offense was not time-barred and the defendant either requested or acquiesced in the giving of instructions on the lesser offense." (*Id.* at p. 1150.)  But *Stanfill* did not involve section 954 and is not controlling.  In that case, the defendant's acquiescence to instructions on the lesser included offense was significant because the statute of limitations would have otherwise barred his conviction of that offense.  In contrast, Scott could have been properly convicted of either the greater offense or the lesser included offense, just not both.  The Attorney General has not cited any decision in which such a claim of an improper conviction of a lesser included offense has been deemed forfeited, and we are aware of none.  Moreover, we note that claims are not subject to forfeiture when they are based on section 654, which governs "the closely related question of when a defendant may receive multiple sentences based upon a single act or course of conduct." (*People v. Ortega* (1998) 19 Cal.4th 686, 692, italics omitted; *People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3; *People v. Mustafaa*

17

(1994) 22 Cal.App.4th 1305, 1312, fn. 2.)  We therefore consider the merits of Scott's claim.[27]

In other contexts, two tests have developed for determining whether an *uncharged* offense is a lesser included offense of another:  the statutory-elements test, which turns on whether " 'the statutory elements of the greater offense include all of the statutory elements of the lesser offense,' " and the accusatory-pleading test, which turns on whether " 'the facts alleged in the accusatory pleading include all of the elements of the lesser offense.' " (*People v. Sloan*, *supra*, 42 Cal.4th at p. 117.)  But where, as here, a defendant is convicted of multiple *charged* offenses, only the statutory-elements test applies.  (*Id.* at p. 118.)

As the Attorney General essentially concedes, false imprisonment by violence is a lesser included offense of kidnapping for robbery under the statutory-elements test.  False imprisonment by violence is a lesser included offense of simple kidnapping.  (*People v. Gibbs* (1970) 12 Cal.App.3d 526, 547; see also *People v. Magana* (1991) 230 Cal.App.3d 1117, 1120-1121.)  In turn, simple kidnapping is a lesser included offense of kidnapping for robbery.  (*People v. Montes*, *supra*, 58 Cal.4th at p. 874.)

The Attorney General argues, however, that the kidnapping of A.S. and the false imprisonment of A.S. were "distinct and independent crimes" because they were based on different facts, rendering the prohibition on multiple convictions "arising out of the same act or course of conduct" inapplicable.  (*People v. Sanders*, *supra*, 55 Cal.4th at p. 736.)  She claims that the "imprisonment was independent of the kidnapping" because the kidnapping for robbery ended, and the false imprisonment began, once A.S. was "robbed . . . of her keys" and some of the perpetrators "left their place of safety at the abandoned house to commit other crimes at the check-cashing business."

But whether the *robbery* of A.S. was complete does not control whether the *kidnapping for robbery* was complete.  To be convicted of kidnapping for robbery, a "defendant need only have the specific intent to commit a robbery when the kidnapping

---

[27] As a result, we need not address Scott's alternative argument that the failure to preserve this issue below constituted ineffective assistance of counsel.

18

begins" and may be found guilty even if no robbery is actually committed. (*People v. Lewis* (2008) 43 Cal.4th 415, 518-519.) The crime of kidnapping for robbery thus continues until " 'the kidnapper releases or otherwise disposes of the victim and [the defendant] has reached a place of temporary safety,' " regardless whether the intent to rob continues or not. (*People v. Palacios* (2007) 41 Cal.4th 720, 724, 726 [kidnapping of robbery victim continued after victim's items stolen while victim was still detained].) Here, the kidnapping continued after A.S.'s keys were taken, and the kidnapping and false-imprisonment convictions were therefore based on the same conduct: A.S.'s detention from the time of the carjacking until her release. As a result, Scott was improperly convicted of both charges.

*People v. Wiley* (1994) 25 Cal.App.4th 159, the primary authority on which the Attorney General relies, is inapposite. In that case, the defendant was convicted of kidnapping for robbery and kidnapping for ransom after he tried to rob the victim when the victim was using an ATM. (*Id.* at p. 162.) When the ATM did not work, the defendant kidnapped the victim and forced him to try a different ATM, which also did not work. (*Ibid.*) The defendant then demanded that the victim's wife give him money for the victim's release and drove to meet her, at which point he was caught. (*Ibid.*) The Court of Appeal rejected the defendant's argument that he could not be convicted of both offenses on the basis that neither was a lesser included offense of the other, *not* on the basis that they involved a separate course of conduct. (*Id.* at pp. 162-163.) Indeed, the court stated, "The commission of the[] offenses occurred during the same general transaction." (*Id.* at p. 163.) Although the court also observed in dicta that "the kidnapping for robbery terminated before the detention for extortion began" (*ibid.*), that statement is inconsistent with the facts set forth in the decision and the holding in *People v. Palacios*, *supra*, 41 Cal.4th at p. 726. We follow *Palacios* and conclude here that Scott could not be convicted of false imprisonment by violence because that charge involved the same conduct as the kidnapping charge.

19

D.    *The Trial Court Properly Refused to Suspend the Proceedings Because No Substantial Evidence of Scott's Incompetency Was Presented.*

Scott argues that the trial court erred by refusing to suspend the proceedings and conduct a hearing on his mental competency after his trial counsel raised a concern during the trial's sanity phase that he was no longer competent. We are not persuaded.

During the sanity phase, Scott's trial counsel voiced her "doubt as to his competency to meaningfully assist counsel and to understand the nature of the proceedings that are going on in court today." She acknowledged "Scott's uncooperativeness in the past," which she believed was "decisional," but she stated that "his condition [had] become more and more withdrawn and disassociated during the last two weeks as [she had] attempted to talk to him." She observed, "At this point[,] he does not give me meaningful answers [to] any questions about how we should proceed. He has not expressed any interest in the verdicts. He was not willing to discuss with me the sanity phase of the trial." She concluded that it was her "personal opinion that [Scott was] unable to rationally assist [her] in this proceeding," and she requested that the trial be suspended for an evaluation of his competence.

The prosecutor objected, characterizing Scott as "a person that intentionally evades the court process and neglects the court process to get what he wants." The trial court agreed, observing, "I've had enough interaction with . . . Scott when he's come into court. He is manipulative. He makes all these claims about his mental health issues. [¶] I've also read records in the jail where he is fine except when he comes to court or he's interacting with [his trial counsel]. [¶] . . . [¶] It is infuriating that we are almost five months into a trial and we've had these continual problems with this manipulative man who keeps playing the system to avoid going to prison." The court refused to suspend the proceedings, but it decided to "appoint a doctor [to evaluate Scott] pursuant to [Evidence Code section 730] to protect the record," despite its belief that Scott would refuse to see the doctor.

Nine days later, the trial court and the parties reconvened after the appointed doctor, Dr. Terrence Riley, submitted his report. As the court predicted, Scott had

20

refused to meet with Dr. Riley. The report, therefore, was based only on a review of Scott's records. Dr. Riley's report described three previous evaluations of Scott's mental health by other doctors, which showed Scott had been diagnosed with various mental disorders but also that "he was . . . malingering and otherwise feigning at times." The report concluded:

> [Scott] has a mental disorder which causes psychotic symptoms and interferes with his reality testing and probably with [his] thought processes and judgment as well. It would be plausible for him to break down under stress and manifest these problems at times such as being on trial. It must also be kept in mind that he has a history of malingering in reference to this case. The determination of whether he is malingering and how psychotic he is at present is much less certain, especially since this writer was unable to interview him or to have access to records after the end of 2011.
>
> It can thus only be stated that he is likely to have a mental disorder which may cause him to decompensate under stress into a state that could cause him to be incompetent to stand trial.

After hearing additional argument from the parties, the trial court determined that a full hearing on Scott's competency was unwarranted. It agreed that Scott had "mental health issues," but it found that Dr. Riley's report was "inconclusive" and did not raise a doubt about Scott's competency.

A defendant who "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" is not competent to stand trial. (§ 1367, subd. (a); *People v. Ramos* (2004) 34 Cal.4th 494, 507.) "Both federal due process and state law require a trial [court] to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) In this context, substantial evidence is that which "raises a reasonable doubt on the issue" of the defendant's mental competence. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047.) Our state Supreme Court "ha[s] said that this standard is satisfied if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that,

21

because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense." (*Ibid.*)

Scott argues that his trial "counsel's representations to the court, Dr. [Riley]'s report, and the extensive mental health testimony presented during the guilt and [sanity] phases of trial regarding [his] long history of mental illness constituted substantial evidence" that raised a doubt about his competence. We consider each type of evidence in turn.

First, Dr. Riley's report expresses no definitive opinion on whether Scott was competent, which is understandable given Scott's refusal to see Dr. Riley. The bulk of the report discusses whether Scott had a mental illness, not whether any such mental illness rendered Scott incompetent. Whether Scott had " 'a preexisting psychiatric condition,' " however, has "little bearing on the question . . . whether [he could] assist his defense counsel." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 847.)

The lone statement in Dr. Riley's report that Scott was "likely to have a mental disorder which *may* cause him to decompensate under stress into a state that *could* cause him to be incompetent to stand trial" is simply too speculative to constitute substantial evidence of incompetency. (Italics added.) Dr. Riley was unable to determine whether Scott even had a mental disorder, much less say with any degree of certainty what effect such a disorder might have on Scott's competency. As a result, Dr. Riley's report is readily distinguishable from the expert evidence at issue in the primary decision on which Scott relies. (*People v. Murdoch* (2011) 194 Cal.App.4th 230, 233, 238-239 [holding there was substantial evidence of incompetency where expert reports concluded "defendant had a 'major' or 'severe' mental illness" and "could decompensate and become incompetent if he continued to refuse medication" and where defendant's statements in court suggested "he had in fact decompensated and become incompetent as the experts had warned"].)

Similarly, the expert testimony presented throughout the trial was not substantial evidence of incompetency because it addressed only whether any mental illness Scott may have had affected his guilt of the crimes charged, not whether such illness rendered

22

him incompetent to stand trial. None of the testimony Scott cites bears on the latter question. Again, standing alone, testimony that Scott was mentally ill was of limited relevance to determining his competency. (See *People v. Rogers*, *supra*, 39 Cal.4th at p. 847.)

Finally, the opinion of Scott's trial counsel that he might be incompetent was insufficient, without more, to trigger the requirement that a hearing be held. (*People v. Welch* (1999) 20 Cal.4th 701, 742.) Scott does not argue otherwise, claiming only that his counsel's opinion had to be "given due consideration by the [trial] court." We agree that counsel's opinion about a defendant's competence "is undoubtedly relevant" to the determination whether a hearing should be held. (*People v. Howard* (1992) 1 Cal.4th 1132, 1164.) But the court *did* consider counsel's opinion and, given the lack of any other evidence of incompetency, it properly refused to suspend the proceedings and conduct a hearing based on that opinion alone.

E.      *Certain Arming Enhancements Imposed Against Lampkin Must Be Stricken.*

Lampkin argues that the trial court erred by imposing terms for arming enhancements alleged under section 12022, subdivision (a)(1) as to his conviction of exhibiting a firearm to a peace officer (count 6) and his five convictions of assault with an assault weapon on a peace officer (counts 7 and 25 through 28) because arming was an element of those offenses. The Attorney General concedes that all six enhancements should be stricken, and we agree.

Under section 12022, subdivision (a)(1), "a person who is armed with a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment . . . for one year, unless the arming is an element of that offense." Being armed with a firearm is an element of both exhibiting a firearm to an officer and assault with a machine gun on an officer. (§§ 245, subd. (d)(e), 417, subd. (c); see also *People v. Sinclair* (2008) 166 Cal.App.4th 848, 855-856 [being armed

23

is element of assault with a firearm].)  As a result, these six enhancements were improperly imposed.[28]

### III.
### DISPOSITION

Scott's conviction for false imprisonment by violence is reversed.  The enhancements accompanying Lampkin's convictions of counts 6, 7, 25, 27, and 28 are ordered stricken and the main term for count 26 is ordered reduced by four months.  In addition to reflecting these changes, the modified abstracts of judgment must correct the errors identified in footnotes 20 and 22.  The clerk of the court is ordered to forward copies of the modified abstracts of judgment to the Department of Corrections and Rehabilitation.  Both judgments are otherwise affirmed.

---

[28] Lampkin's abstract of judgment incorrectly reflects the enhancements for counts 6, 7, 27, and 28 were under various statutes other than section 12022, subdivision (a)(1).  In addition, the abstract of judgment incorrectly reflects the four-month term for the enhancement accompanying count 26 was part of the main term instead of a separate enhancement.  Thus, the main term for that count must be reduced by four months.

_____

Humes, P.J.

We concur:

_____

Dondero, J.

_____

Banke, J.